## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STEVEN DEHART,

     Plaintiff,

     v.

BOARD OF COUNTY COMMISSIONERS OF
RILEY COUNTY, KANSAS,

     Defendant.

Case No. 5:19-CV-04022-HLT

## MEMORANDUM AND ORDER

Plaintiff Steven DeHart sued his former employer, Defendant Board of County Commissioners of Riley County, Kansas ("the County") for wrongful termination under 42 U.S.C. § 1983 and Kansas law. DeHart claims he was terminated for exercising his First Amendment rights and for whistleblowing. The County contends he was fired for insubordination and moves for summary judgment on DeHart's claims.

The Court concludes that DeHart can sustain his First Amendment retaliation claim based on statements about a county commissioner's sewer connection. But his reports to state and federal authorities about public water issues were made pursuant to his official duties as Environmental Health Supervisor for the County and are therefore not protected by the First Amendment. Further, DeHart's whistleblowing claim fails because his conduct is not protected under state law.

## I.   BACKGROUND

### A.   DeHart's Job Duties and Responsibilities

DeHart was the Environmental Health Specialist for the Riley County Planning and Development Department. Doc. 37 at 3-4. Monty Wedel, the Director of the Planning and

Development Department, was DeHart's supervisor. *Id.* at 2. Wedel answered to the Board of County Commissioners. *Id.*

As Environmental Health Specialist, DeHart worked with the public to evaluate compliance with and to administer the Riley County Sanitary Code. *Id.* at 4. Another duty was "signing off" on building permits for compliance with the Riley County Sanitary Code. *Id.* at 4-5. But public water supplies were not within DeHart's regulatory authority. *Id.* at 4. Nor was it part of DeHart's job to notify the City of Manhattan about people who had illegal sewer connections. *Id.* at 5.

### B.      Reports to State and Federal Officials

### 1.      Riverchase Reservoir

In 2014, DeHart received a report that children in the Riverchase trailer court were getting sick. *Id.* at 8. An investigation determined that a lid that is normally in a locked position was open, and it was allowing contaminants into the Riverchase Reservoir. *Id.* It was within DeHart's job description to inspect the Riverchase Reservoir as the Environmental Health Specialist because there was a complaint about an environmental health concern. *Id.* He took photos, documented his findings in county records, and reported the issue to the state. *Id.* DeHart also prepared a Request to Prosecute Emergency Order Violation #14-0034 regarding the Riverchase Reservoir, though Wedel did not sign it. *Id.* at 8-9; *see also* Doc. 37-10 at 9. The request noted a violation of a public water reservoir and sought to evaluate the water supply and make necessary repairs. Doc. 37-10 at 9. But the request did not progress because it involved a public water supply and was not within the purview of the Riley County Sanitary Code. Doc. 37 at 9.

DeHart also spoke to a Kansas Department of Health and Environment ("KDHE") employee about it. *Id.* But he was told by KDHE that "Riley County is to stay out of 'Public Water

Systems.'" *Id.* Because he could not resolve the matter with the state, DeHart then contacted an Environmental Protection Agency ("EPA") employee and asked for a criminal investigator to contact him. *Id.* DeHart identified himself in the complaint to the EPA and gave his work phone number and work email address. *Id.* at 13. The state later complained to Wedel that the County was not working with them. *Id.* at 10. Wedel told DeHart that he should limit his regulatory actions to things under the Riley County Sanitary Code. *Id.*

### 2.      Rocky Ford Water District

DeHart also complained to KDHE and EPA about the Rocky Ford Water District. *Id.* That complaint stemmed from a citizen complaint about water that smelled like sewage. *Id.* DeHart tested the water in his office, though using his own private equipment, and found that it had no residual chlorine. *Id.*; Doc. 40 at 12. He then reported his findings to KDHE. Doc. 37 at 10. But a subsequent test by a KDHE employee found chlorine. *Id.*

A KDHE employee later made an appointment with Wedel and DeHart to complain about DeHart's actions, apparently as a result of both the Rocky Ford Water District and the Riverchase Reservoir issue. *Id.* at 10-12. KDHE employees were upset that DeHart had not cooperated with them and had gone to EPA to complain, and that DeHart was outside his authority. *Id.* at 12. Wedel, after consultation with the County counselor, instructed DeHart that he was not to go outside the department and should instead report any issues to Wedel. *Id.* at 11. Wedel told DeHart that it was not his role to advocate for citizens, report issues to EPA, or to monitor how the state was handling any issues. *Id.* at 12. Wedel specifically told DeHart that, should he make further attempts to address compliance issues with regard to public water supplies, it would result in DeHart's dismissal. *Id.* at 11. Wedel documented this instruction in writing, dated July 20, 2015, which stated: "This is to document that I informed Steve DeHart not to have any further communication

with the State of Kansas, KDHE, and/or EPA until further notice." *Id.* DeHart was to confine his regulatory actions to the Riley County Sanitary Code, which involved on-site wastewater systems and individual wells. *Id.* at 12-13. If he discovered any issues, DeHart was to report them to Wedel or the director of the health department. *Id.* at 13. If he did not follow this "new law," he would be fired. *Id.*[1]

### 3.     Wells Sewer Connection

Ron Wells, a county commissioner, owned some family property just outside of Manhattan in Riley County. *Id.* at 14. At some point, it was discovered that improvements had been made on the property without required building permits. *Id.* Because the improvements included a bathroom, the question arose of whether wastewater was being properly handled. *Id.*

The zoning enforcement officer with the Planning and Development Department generally cannot issue a permit unless all sanitary code issues are resolved—something that involved DeHart in the permit approval process. *Id.* After Wells applied for a building permit, DeHart reviewed the permit application and determined that the property did not have a septic permit or a permitted city sewer connection. *Id.* DeHart reported this to Wedel, who contacted the city regarding any agreements related to sewer connections. *Id.* at 14-15. After several meetings involving DeHart, Wedel, and city officials, it was determined that the property was in fact connected to the city sewer. *Id.* at 15 Wells claimed the connection was legal because there was an historical agreement authorizing the connection and an agreement by the city to provide free sewer service to the property. *Id.* at 15-16. The County investigated this claim. *Id.* at 16. Although no agreement to

---

[1]   In July 2015, DeHart also reported an overflowing wastewater lagoon to EPA. Doc. 37 at 10. It is unclear how this event relates to any of the others discussed, as no additional facts about this event are provided. Other than passing reference in the statement of facts, it is not discussed by either party.

waive fees was found, the grant of a connection was found. *Id.* at 18. The County concluded that the sewer connection was valid and issued the building permit. *Id.* at 16, 18.

DeHart did not believe there was any historic agreement regarding the Wells sewer connection and thought the sewer connection was illegal, though he has no knowledge as to whether the connection to the Wells property was made with the full knowledge and consent of authorities at the time. *Id.* at 16; *see also* Doc. 40 at 12. DeHart's responsibilities as to the Wells property were limited to assessing whether the property complied the Riley County Sanitary Code. Doc. 37 at 17. Because the property was connected to a sewer system, it did not violate any provision of the Riley County Sanitary Code. *Id.* Nevertheless, DeHart did not want to sign off on the building permit for the Wells property because he had concerns that a county commissioner was getting special treatment. *Id.* Wedel told him that, based on his investigation, Wells's explanation for his sewer connection was reasonable, and whether he should be paying fees was between him and the city, not the County Planning and Development Department. *Id.* Wedel and the County counselor both advised DeHart to sign the permit. *Id.* at 19. But DeHart refused. *Id.* Instead, Wedel signed it. *Id.*[2]

DeHart told Wedel that he was going to take the issue to the City of Manhattan. *Id.* Wedel said he should not, and it would be viewed as insubordination if he did. *Id.* There is no evidence that DeHart reported any concerns about the Wells sewer connection to any regulatory authority or the press until after he was terminated.[3] *Id.* at 19-20. But he did speak to individual members of

---

[2]   The County's statement of facts, which is almost entirely undisputed by DeHart, states that the permit was issued on April 15, <u>2014</u>. Doc. 37 at 19. But the underlying documents cited suggest that this all occurred in <u>2016</u>. *See generally* Doc. 37-15. The date on the permit is April 15, 2016. *Id.* at 4.

[3]   DeHart argues that this fact is not supported by any evidence. Doc. 40 at 7. But the County cannot cite evidence showing an absence of evidence. Rather, after pointing to the lack of evidence, the burden shifts to DeHart to point to evidence that demonstrates that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (stating that

the public about the Wells sewer connection. Doc. 40 at 13. Wedel brought up the issue "pretty continuously" and made several comments about the issue over several months. *Id.* Wedel told DeHart that, if he did not let the issue with the Wells property go, he could be terminated. *Id.*

### C.  DeHart's Termination

In early August 2017, Wedel had a conversation with a county commissioner, Marvin Rodriguez, about septic tank enzyme additives and wastewater systems. Doc. 37 at 25. Wedel suggested they talk to DeHart about it. *Id.* When they did, Wedel thought that DeHart's response to Rodriguez was "very condescending" or curt, and he was afraid Rodriguez would be offended by DeHart's response. *Id.* Wedel told DeHart that he had embarrassed Rodriguez, and that Wedel was upset with the way DeHart had handled the conversation. *Id.* DeHart did not want to apologize and thought that Wedel was more upset about the conversation than Rodriguez was. *Id.* at 25-26.

Also in August 2017, the department's administrative assistant was set to return to work after an extended absence. *Id.* at 26. Wedel told DeHart that "he needed to walk on eggshells" and avoid confrontations with her. *Id.* But DeHart did not comply. *Id.* at 27. Wedel believed that DeHart was intentionally being uncooperative. *Id.* at 28.

When Wedel and DeHart discussed the issue about the administrative assistant, the subject of the conversation with Rodriguez came up, and Wedel told DeHart that he had heard Rodriguez had been offended. *Id.* DeHart denied being curt and said that Rodriguez had "attacked" him. *Id.* Since Wedel had been present for the conversation and thought there was no reasonable way DeHart could make such a claim, Wedel decided to suspend DeHart without pay. *Id.* at 28-29.

---

the nonmovant "may not rely merely on . . . its own pleadings" and instead "must come forward with facts supported by competent evidence" to demonstrate a triable issue of fact (internal quotations and citations omitted)).

Wedel discussed the issue with HR and the county counselor, who agreed suspension without pay was appropriate. *Id.* at 29. They also told Wedel he could fire DeHart if DeHart did not accept the suspension. *Id.* Wedel called DeHart into his office and asked him to read and sign the suspension letter, and then go immediately home without talking to anyone. *Id.* at 29-30. Instead, DeHart went to a co-worker's office. *Id.* at 30. Wedel saw that, and then went to clarify with DeHart that he had been told to review and sign the letter, and then go home. *Id.* Wedel said that if DeHart did not comply, he would be fired. *Id.* DeHart went back to his office but started complaining about the suspension letter. *Id.* At that point, Wedel fired him. *Id.*

Wedel signed the personnel action form for DeHart's termination on August 22, 2017. *Id.* at 31. The County, through the Board of County Commissioners, reviewed and approved DeHart's termination on August 24, 2017. *Id.* The Board does not fire employees, other than department directors. *Id.* But there is no evidence that it has disagreed with a department head's termination recommendation.[4] The Riley County Personnel Policy states that department heads are responsible for discipline of their employees. *Id.* at 31-32. But all disciplinary actions are subject to review and approval by the Board if requested by the employee. *Id.* at 32. If an employee refuses to indicate whether he requests review, the Board will review the action. *Id.* DeHart did not timely request review by the Board.[5] *Id.* at 33. On August 31, 2017, the Board reviewed DeHart's termination in his absence. *Id.*

---

[4]   The County's statement of facts states, "There is no evidence the county commissioners has not disapproved of a recommendation from a department head for termination." Doc. 37 at 31. Although this statement is not disputed by DeHart, it appears to be a typo. The cited deposition testimony from Wells was that he knew of no instances where the Board decided "not to approve a recommended termination from a department head." Doc. 37-3 at 18 (deposition page 69:1-5).

[5]   DeHart again objects to this fact by stating it is not supported by any evidence. Doc. 40 at 11. But the County cannot cite evidence showing an absence of evidence, and it is DeHart's burden to point to evidence that demonstrates this is a genuine issue of fact for trial. *See supra* note 3.

## II.      STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita*, 475 U.S. at 586-87. In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the nonmoving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.     ANALYSIS

### A.      The County's *Monell* Defense

Although addressed second in the County's motion, a preliminary issue is whether the County can be held liable for DeHart's termination under 42 U.S.C. § 1983 and *Monell v. Dep't of Social Services*. The County argues that no custom, policy, or practice of the County caused DeHart's termination. Rather, it argues that DeHart was simply fired for insubordination by Wedel, and that no policy or custom can be attributed to any violation of DeHart's rights sufficient to hold the County liable. Doc. 37 at 38-39. DeHart contends that the County officially approved DeHart's termination and therefore adopted the decision as its own. Doc. 40 at 22.

A municipality can only be held liable under 42 U.S.C. § 1983 for the actions of its employees when the action is taken pursuant to the municipality's "official policy," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)), or for acts it has sanctioned or ordered, *Brammer-Hoelter v. Twin Peaks Charter Acad.*,

602 F.3d 1175, 1188 (10th Cir. 2010) (citing *Pembaur*, 475 U.S. at 480)).[6] This is because a municipality cannot be held liable simply under a theory of respondeat superior. *Pembaur*, 475 U.S. at 478; *see also Monell*, 436 U.S. at 694. "Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). Municipal policy can take the form of, among other things, "the decisions of employees with final policymaking authority or the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Brammer-Hoelter*, 602 F.3d at 1189.

Here, Wedel terminated DeHart, and the County then reviewed and approved the decision. Doc. 37 at 31-33. This was in accordance with the Riley County Personnel Policy, which specifically stated that department heads like Wedel "have the duty and the responsibility to investigate and discipline employees . . . subject to the approval of the Riley County Board of Commissioners." *Id.* at 31. The permitted discipline included termination, and all disciplinary actions are subject to review and approval by the Board. *Id.* at 32. Review occurs whether the employee requests it or not. *Id.* So, in other words, the County endowed Wedel with decision-making authority to terminate DeHart and then reviewed and approved the same. This is enough to hold the County liable under *Monell*, to the extent DeHart can establish a violation of his rights. *See Brammer-Hoelter*, 602 F.3d at 1190 (stating that the entity defendant can only be subject to municipal liability if the record demonstrates that the entity defendant delegated authority to the

---

[6]   *Monell* is only a defense to municipal liability in cases brought under 42 U.S.C. § 1983. Accordingly, although neither party directly discusses it, this argument would have no bearing on DeHart's state-law claims.

individual defendant to make decisions subject to the entity's final review and approval, and the entity ratified the decisions).

## B.    First Amendment Retaliation Under 42 U.S.C. § 1983

The Court next turns to DeHart's First Amendment retaliation claim under 42 U.S.C. § 1983. A government employee enjoys First Amendment protections and cannot be fired for exercising those rights. *Helget v. City of Hays, Kan.*, 844 F.3d 1216, 1221 (10th Cir. 2017). At the same time, however, "a public employer must be able to control the operations of its workplace." *Id.*; *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (noting that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer"). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. To balance these competing interests, courts rely on the *Garcetti/Pickering* test, which has five steps:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)); *see also Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010). The first three steps are questions of law for the court to decide, while the last two are questions of fact. *Rohrbough*, 596 F.3d at 745.[7]

---

[7]   The Tenth Circuit states that disputed facts should be viewed in a light most favorable to the non-moving party when evaluating step one of the *Garcetti/Pickering* analysis. *Rohrbough*, 596 F.3d at 746. Here, however, the facts are almost all undisputed.

At issue here is whether DeHart's speech was pursuant to his official duties—a question of law.[8] *See Chavez-Rodriguez*, 596 F.3d at 713; *see also Garcetti*, 547 U.S. at 421. When an employee speaks pursuant to his official duties, he is not speaking as a citizen for First Amendment purposes, and he is not protected from discipline from his employer. *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1328 (10th Cir. 2007). The rule "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* (quoting *Garcetti*, 547 U.S. at 422).

The Tenth Circuit takes a broad view in deciding whether speech is pursuant to an employee's official duties. *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008). There are no bright-line rules that guide this determination. *Rohrbough*, 596 F.3d at 746. Instead, it is a practical inquiry made on a case-by-case basis. *Id.* That the speech concerns the general subject matter of an employee's job is not dispositive, nor is a written job description. *Garcetti*, 547 U.S. at 421, 424-25. But speech that "owes its existence to a public employee's professional responsibilities" is generally not protected. *Id.* at 421-22; *see also Rohrbough*, 596 F.3d at 746 (noting that speech that has "no relevant analogue to speech by citizens who are not government employees" is generally not protected) (quoting *Garcetti*, 574 U.S. at 424)).

Although no one factor is determinative, *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018), a guiding principle is that the speech stemmed from and involves the type of activities the employee is paid to do, *Chavez-Rodriguez*, 596 F.3d at 716. Speech that an employee has a duty to make is usually within that employee's official duties. *Rohrbough*, 596 F.3d at 746-47. But, at

---

[8]  The County only argues that DeHart's federal First Amendment retaliation claim fails because his statements were all pursuant to his official duties—the first prong of the *Garcetti/Pickering* test. In response, DeHart disputes that point but also argues that his speech was a motivating factor in adverse employment actions, and that the County has no evidence it would have fired him in absence of his protected speech. Doc. 40 at 20-22. But because the County only moves on the first prong of the *Garcetti/Pickering* test, the Court does not consider whether DeHart's claims are sufficient on any of the other elements.

the same time, "the court has not foreclosed unauthorized speech or speech 'not explicitly required as part of [an employee's] day-to-day job' from being within the scope of that employee's official duties under *Garcetti/Pickering*." *Id.* (quoting *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 800-01 (10th Cir. 2007) (brackets in original)). Nor is speech to someone outside the chain of command automatically protected. *Rohrbough*, 596 F.3d at 747.

The focus always returns to whether the speech stemmed from and was of the type the employee was paid to do "regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Id.* Disagreement with how the job is done or ought to be done does "not invest [employees] with a right to perform their jobs however they see fit." *Id.* (quoting *Green*, 472 F.3d at 798). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418.

The County argues that DeHart's speech was not protected by the First Amendment because he was speaking pursuant to his duties as the County's Environmental Health Officer. Specifically, it argues that all the speech "owes its existence" to DeHart's professional responsibilities because the issues all came to his attention because of his job, all investigations were by him or his co-workers, and he gave his work email and phone number when making the complaints. Doc. 37 at 37.[9] DeHart argues there were two categories of allegedly protected speech: "(i) reports to members of the public, KDHE and EPA;[10] and (ii) whistleblowing on Mr. Wells'[s] undocumented free sewage connection." Doc. 40 at 17. But he claims neither were made pursuant to his employment duties.

---

[9] The County makes little effort to distinguish among the specific instances of speech at issue.

[10] This category of speech apparently includes DeHart's complaints to KDHE and EPA about the Riverchase Reservoir, an overflowing wastewater lagoon, and the Rocky Ford Water District.

### 1.    Statements to KDHE and EPA

Regarding his statements to KDHE and EPA, it is undisputed that "DeHart's inspection of the Riverchase reservoir was within his job duties as the Riley County Environmental Health Specialist." Doc. 37 at 8; *see also id.* at 9 (undisputed fact that it "was part of DeHart's job to inspect the Riverchase reservoir"). After investigating the reservoir, he documented his findings in Riley County records. *Id.* at 8-9. He then called KDHE and advised that he intended to issue an emergency order, which was on county letterhead and signed by DeHart with his county title as Environmental Health Specialist. *Id.*; Doc. 37-10 at 9. DeHart initially tried to resolve the issue with KDHE because it was a state issue. Doc. 37 at 8-10. When the state did not resolve the issue to DeHart's satisfaction, he reached out to the EPA using his work email and phone number. *Id.* Likewise, he investigated the Rocky Ford Water District after receiving a "citizen complaint" and tested the water in his office (though he apparently used his own equipment) before reporting the findings to KDHE. *Id.* at 10.

Based on these undisputed facts, the Court concludes that DeHart's reports to KDHE and EPA were pursuant to his official duties.[11] DeHart maintains that "[p]ublic water issues were not within the scope of DeHart's employment." Doc. 40 at 17. But DeHart was tasked with investigating environmental issues; he learned of these issues through his job, investigated them as part of his job, and then tried to resolve the issues by contacting state and federal officials who could resolve public water issues. This speech was a natural extension of DeHart's work, even if the specific subject matter was not within his jurisdiction to resolve personally. *See Garcetti*, 547

---

[11]  In response to the County's motion, DeHart set forth some additional statements of fact, including that his reports to KDHE and the EPA about the Riverchase Reservoir and the Rocky Ford Water District were outside the scope of his employment duties. *See* Doc. 40 at 11-12. But whether an employee is speaking pursuant to his job duties is a question of law for the Court to decide, DeHart's conclusory statements to the contrary notwithstanding. *See Rohrbough*, 596 F.3d at 745.

U.S. at 421-22 (noting that speech that "owes its existence to a public employee's professional responsibilities" is generally not shielded from employer discipline under the First Amendment); *Chavez-Rodriguez*, 596 F.3d at 716 (noting that a guiding principle in an official-duty analysis is that the speech <u>stemmed from</u> and involves the type of activities the employee is paid to do). He also made reports to state and federal officials using his work contact information and official title, and he tried to issue an emergency order on his department letterhead. Although using work numbers and emails may not be dispositive (as almost no one factor is in this analysis), *see Knopf*, 884 F.3d at 953-54,[12] it certainly suggests here that DeHart was making those reports as the Environmental Health Specialist for Riley County, and not as a private citizen, *see Green*, 472 F.3d at 800-01.

DeHart argues that he "had no duty to report public water issues to the KDHE or EPA." Doc. 40 at 17. But the fact that DeHart's speech was to agencies outside his own does not automatically render his speech protected, as no one factor controls this analysis. Nor is it dispositive that DeHart had no legal or official duty to speak out. *See Rohrbough*, 596 F.3d at 747 (noting that speech not explicitly required can still fall under an employee's official duties under *Garcetti*); *see also Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 202 (2d Cir. 2010) (noting "that speech that government employers have not expressly required may still be 'pursuant to official duties,' so long as the speech is in furtherance of such duties").

DeHart also argues that, although he initially learned of the regulatory failures through his job, he only spoke out of fear for community safety, and thus he did not speak pursuant to his employment duties. Doc. 40 at 18. But what DeHart ignores is that he did not just learn of these

---

[12] The primary opinion in *Knopf* addressed whether the First Amendment retaliation claim was clearly established for purposes of a qualified-immunity claim. Judge Briscoe's concurrence, which was adopted by the primary opinion, addressed the additional qualified-immunity question of whether there was a constitutional violation. *See Knopf*, 884 F.3d at 951.

issues through his job, and then speak out as a private citizen. He spoke to state and federal authorities as Environmental Health Specialist in an attempt to resolve complaints and investigations he was working on as part of his job. It is also undisputed that DeHart believed he had the authority to issue emergency orders, like he tried to do with regard to the Riverchase Reservoir. Doc. 37 at 12-13. He then had to be reprimanded to stay in his lane. *Id.* But his attempted overreach does not change the fact that DeHart was purportedly attempting to act as part of his official duties. *See Garcetti*, 547 U.S. at 422-23 ("Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission."). Accordingly, the Court finds that DeHart's reports to KDHE and EPA were pursuant to his official duties and are not protected under the First Amendment.

### 2.    Statements About the Wells Sewer Connection

It is a closer question whether DeHart's statements about the Wells sewer connection were pursuant to his official duties. The County makes no distinction in its analysis between this issue and DeHart's reports to KDHE or EPA. Instead, the County only cursorily argues that any statements by DeHart about the Wells sewer connection "came to his attention *because* of his position." Doc. 37 at 37.

There are certainly facts that suggest that any statement by DeHart about the Wells sewer connection "owes its existence" to his job. *See Garcetti*, 547 U.S. at 421-22. Specifically, DeHart only learned of the issue with the Wells sewer because it was his job to sign off on building permits to ensure that all projects complied with the Riley County Sanitary Code. Doc. 37 at 14. But the statements at issue go beyond that and reflect DeHart's apparent belief that the Wells sewer connection was not legal—not that it did not exist for purposes of the Riley County Sanitary Code.

In this way, this case is like *Thomas v. Blanchard*. In that case, a building inspector discovered that an inspection certificate had been completed and signed for a property being built by the city's mayor, even though the inspection had not occurred yet. *Thomas*, 548 F.3d at 1320-21. The inspector later confronted city officials and alleged misconduct, and then contacted state law enforcement. *Id.* at 1321. The Tenth Circuit concluded that, although the issue was related to the inspector's job duties, he "was not hired to detect fraud in connection with the issuance of certificates of occupancy; he was hired to inspect houses." *Id.* at 1324. In that way, his "act went well beyond his official responsibilities." *Id.* The Tenth Circuit noted its "broad view" of when speech is pursuant to an employee's official duties. *Id.* But it said "it would be going too far to hold that every time a public employee discovers alleged wrongdoing related to his job and brings it to the attention of law enforcement or other outside parties, the speech is unprotected." *Id.*

Here, although it was DeHart's duty to sign off on building permits to ensure compliance with the Riley County Sanitary Code, it was not his business to determine if the connection was lawful. Thus, unlike his statements to KDHE and EPA where he was trying to resolve issues as Environmental Health Officer, the statements he later made about the propriety of the Wells sewer connection ceased to be pursuant to his official duties. The distinction may be fine, but the Court concludes it is there. Accordingly, the Court denies the County's motion with regard to DeHart's First Amendment retaliation claim based on his statements about the Wells sewer connection.[13]

## C.    Retaliatory Discharge Under Kansas Law

The County also moves for summary judgment on DeHart's state-law retaliatory discharge claims. Kansas is historically an at-will employment state, meaning that employers can typically

---

[13] The County has not moved on any of the other *Garcetti/Pickering* factors. Although it is far from clear that DeHart will be able to ultimately succeed on this claim, the Court does not decide here whether DeHart's claim is sufficient as to any of the remaining factors.

fire employees at any time and for any reason. *Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 3-4 (Kan. 2011). But there are exceptions that protect employees for, among other things, First Amendment speech and whistleblowing. *See Larson v. Ruskowitz*, 850 P.2d 253, 261 (Kan. 1993) (noting that "any protection to be afforded plaintiffs must come through their First Amendment rights of freedom of speech"); *Palmer v. Brown*, 752 P.2d 685, 689-90 (Kan. 1988) ("Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort."). The County argues that it is entitled to summary judgment on both of DeHart's state-law claims because DeHart did not engage in any protected conduct and there is no causal connection to any alleged protected conduct and his termination. Doc. 37 at 39-43.

### 1. First Amendment

As to DeHart's purported state-law claim based on First Amendment activity,[14] both parties just import their arguments regarding DeHart's federal First Amendment retaliation claim. Doc. 37 at 40-41; Doc. 40 at 23. As discussed above, DeHart's First Amendment retaliation claim survives as to his statements about the Wells sewer connection but not as to his statements to KDHE or EPA. The same is true for his state-law claim.[15]

---

[14] Although both parties seem to believe that DeHart has asserted a state-law First Amendment retaliation claim, the Court notes that the Pretrial Order does not state any such claim. It only asserts that the County wrongfully terminated DeHart for whistleblowing and that it wrongfully terminated him in retaliation for First Amendment conduct under 42 U.S.C. § 1983—but not state law. Doc. 35 at 6. But because both parties are proceeding as if DeHart also asserts a First Amendment claim under state law, the Court will deem the Pretrial Order amended to include this claim. *See R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987) ("A pretrial order is also amended in effect where an issue has in fact been tried with the express or implicit consent of the parties.").

[15] Although both parties just incorporate their federal First Amendment retaliation claim into the state-law analysis, DeHart includes a footnote stating that it is unclear whether Kansas courts would apply *Garcetti*'s "pursuant to official duties" standard, although he does so by referencing which law controls in cases of diversity jurisdiction, which is not at issue here. Doc. 40 at 16 n.1. To the extent DeHart is attempting to argue that a different standard controls his federal First Amendment retaliation claim versus his state-law First Amendment retaliation claim, he

### 2.      Whistleblowing

The County argues that neither DeHart's reports to KDHE or EPA about public water issues nor any statements about the Wells sewer connection amount to whistleblowing. Doc. 37 at 41-42. In response, DeHart only argues that his statements about the Wells sewer connection were whistleblowing. Doc. 40 at 23-25. Thus, it does not appear that DeHart is pursuing any claim for whistleblowing regarding the reports to KDHE or EPA.[16]

To assert a claim under Kansas law based on whistleblowing, "an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Palmer*, 752 P.2d at 690. The employer must know of the employee's reporting such violation before termination and must have made the termination decision in retaliation for the report. *Id.* Finally, the whistleblowing must have been done out of a good faith concern and not for a malicious purpose. *Id.*

Retaliatory discharge claims under Kansas law are analyzed under the same *McDonnell Douglas* burden-shifting framework that applies to federal employment claims. *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002). Under that standard, DeHart must first

---

has not sufficiently done so because he only briefly touches on the issue in a footnote. And as noted above, neither party distinguishes their arguments between the First Amendment claim based on federal law versus state law.

[16]  The County argues that DeHart's reports to KDHE and EPA cannot sustain his claim for whistleblowing because they were not a report of any wrongdoing by his co-workers or employers. Doc. 37 at 41-42. Although DeHart does not appear to be pursuing such a claim, the Court agrees that his reports to KDHE and EPA were not alleging any wrongdoing by the County and thus do not meet the standard for whistleblowing under state law. *See Palmer*, 752 P.2d at 690 (noting that a claim for retaliatory discharge based on whistleblowing involves a reasonable belief that "the employee's <u>co-worker or employer</u> was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare"). Specifically, there is no suggestion that DeHart's complaints about the Riverchase Reservoir or Rocky Ford Water District involved or alleged wrongdoing by the County.

establish a prima facie case of retaliatory discharge (as outlined above).[17] Specifically, DeHart must point to facts that demonstrate that "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare," and that the County knew he was reporting such violations. *Palmer*, 752 P.2d at 690.

The County argues that DeHart's "belief" that the Wells sewer connection was unlawful is not a report of a violation of rules, regulations, or the law pertaining to public health, safety, or the general welfare. Doc. 37 at 42. Further, it suggests that DeHart's disagreement with Wedel about the legality of the connection does not qualify as whistleblowing. *Id.*

The Court agrees with the County. First, the only evidence that the Wells sewer connection reflected a violation of a regulation or law pertaining to public health, safety, or the general welfare is DeHart's "belief" that it was illegal or fraudulent based on his apparent knowledge that the City of Manhattan had treated "connections made without the City's knowledge as illegal" in the past, though he has no information about whether the connection was, in fact, made without knowledge. Doc. 40 at 12; *see also* Doc. 37 at 16 (undisputed fact that "DeHart has no knowledge as to whether the sewer connections serving the Wells Trust Property were made with full knowledge and consent and approval of the county engineer at the time"). But DeHart's "belief" is generally insufficient to establish a claim for retaliatory discharge based on whistleblowing. *See Palmer v. Pentair*, 2019 WL 3239350, at *8 (D. Kan. 2019) (noting that a retaliatory discharge claim for violation of public policy "requires plaintiff to clearly allege a violation of specific and definite

---

[17] Typically, if DeHart established a prima facie case of retaliation for whistleblowing, the burden would shift to the County to articulate a legitimate, non-discriminatory reason for his termination. DeHart would then have to point to specific facts that create a triable issue as to whether the stated reason is a pretext for retaliation. *Foster*, 293 F.3d at 1193. But on these two points, the County only offers two brief sentences stating that it has advanced a legitimate non-retaliatory reason for DeHart's termination and DeHart has no evidence of pretext. Doc. 37 at 43. No meaningful analysis can be gleaned from this effort, and thus the Court will not evaluate those issues.

rules, regulations, or laws beyond a mere feeling of wrongdoing"); *see also Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 822-23 (Kan. 2003) ("It would be both troublesome and unsettling to the state of the law if we were to allow a retaliatory discharge claim to be based on a personal opinion of wrongdoing.").

Second, it is unclear that DeHart actually ever blew the whistle. Generally, reports of illegal activity must be made "to either company management or law enforcement officials." *Palmer*, 752 P.2d at 690. Here, it is only alleged that DeHart "spoke to individual members of the public" about the Wells sewer connection before his termination.[18] Doc. 40 at 13-14. Statements to those individuals are not enough under Kansas law.

DeHart also argues that his "internal reporting" to Wedel was sufficient to trigger whistleblower protection. *Id.* at 24. But the undisputed facts demonstrate that, after DeHart discovered there was no recorded sewer connection on the Wells property, both Wedel and DeHart investigated the issue, determined there was a connection, but simply came to different conclusions about whether Wells should be paying fees. Doc. 37 at 14-19. Kansas courts have held that such simple disputes with a manager do not amount to whistleblowing. *See Fowler v. Criticare Home Health Servs., Inc.*, 10 P.3d 8, 15 (Kan. Ct. App. 2000), *aff'd*, 26 P.3d 69 (Kan. 2001) ("*Palmer* simply was not meant to endow every workplace dispute over the water cooler on company practices and the effect of government regulation with whistle-blower overtones.").[19]

---

[18] The County states that there is no evidence that DeHart reported his concerns about the Wells sewer connection to any regulatory entity or the press until after his dismissal. Doc. 37 at 20. The inverse of this statement is that DeHart did not report his concerns to any regulatory entity or the press before he was fired. DeHart has not properly disputed that statement by pointing to evidence demonstrating otherwise. *See supra* note 3.

[19] To be clear, the Court does not hold that reports to immediate supervisors can never amount to whistleblowing. Rather, the facts of this case just do not support that finding here. *See Connelly v. State Highway Patrol*, 26 P.3d 1246, 1266 (Kan. 2001) (acknowledging that internal whistleblowing may be actionable, but that "certainly not every instance of internal complaint should be actionable whistleblowing").

Rather, a "worker who wants to come under the protections of that decision must seek out the intervention of a higher authority, either inside or outside of the company." *Id.*; *see also Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d 857, 863 (Kan. Ct. App. 2009) ("Stated differently, internal whistleblowing is recognized as an actionable tort in Kansas in circumstances where the employee seeks to stop unlawful conduct pertaining to public health and safety and the general welfare by a coworker or an employer through the intervention of a higher authority inside the company."). DeHart argues that Wedel was a proper reporting authority because he had "the authoritative power to remedy the illegal agreement" regarding the Wells sewer connection. Doc. 40 at 25. It is unclear how this is case. DeHart himself acknowledges that Wedel served "under the county commissioners." *Id.* at 24; *see also* Doc. 37 at 2 (undisputed fact that Wedel answered to the Board of County Commissioners and was a Riley County employee). It is unclear under those facts how Wedel, a County employee who was subordinate to the commissioners, would have had any authority to rectify an apparent billing dispute between a county commissioner and the City of Manhattan.

Based on this, the Court concludes that DeHart cannot make out a prima facie case of whistleblowing under Kansas law. Accordingly, his retaliatory-discharge claim on this point must be dismissed.[20]

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that the County's Motion for Summary Judgment (Doc. 36) is GRANTED IN PART AND DENIED IN PART. The County is granted summary judgment in its favor on DeHart's claims based on his reports to KDHE and EPA and DeHart's

---

[20] The County also argues that there is no causal connection between any protected conduct by DeHart and his termination. Doc. 37 at 42-43. Because the Court concludes he did not engage in any protected whistleblowing, it need not reach this argument.

state-law whistleblowing claim regarding the Wells sewer connection. DeHart's First Amendment retaliation claims under both state and federal law regarding his statements about the Wells sewer connection survive. The County's counterclaim for overpayment (*see* Doc. 35 at 7) is not addressed in this order and therefore also remains at issue.

IT IS SO ORDERED.

Dated: May 11, 2020                    /s/ *Holly L. Teeter*
                                       HOLLY L. TEETER
                                       UNITED STATES DISTRICT JUDGE